IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY L. IRVIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 2:05-cv-1072 |
| | ) |
| UNITED MINE WORKERS OF AMERICA | ) Judge Thomas M. Hardiman |
| HEALTH & RETIREMENT FUNDS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. Introduction

On July 8, 2005, Plaintiff Timothy L. Irvin (Irvin) sued the Trustees of the United Mine Workers of America (UMWA) 1974 Pension Trust (Trust), seeking review of the Trustees' denial of his application for disability pension benefits. On August 2, 2005, the UMWA timely removed the matter to this Court, invoking federal question jurisdiction pursuant to 28 U.S.C. §1441 and 29 U.S.C. §1132, because the case arose under the Employee Retirement Income Security Act of 1974 (ERISA).

The parties filed cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure based on the record developed at the administrative proceedings. After nine months of discovery, the UMWA filed its Motion and Brief in Support of Motion for Summary Judgment (Def. Brief) on May 24, 2006, along with the administrative record.[1] That same day,

---

[1] The Administrative Record was filed as Exhibit A to the Defendant's Brief. Because that exhibit is divided into nineteen discrete subparts on the Court's electronic docket (as Doc. Nos. 20-2 through 20-20, inclusive), for ease of reference the Court will cite Exhibit A as "R," followed by the appropriate page number.

Irvin filed his own Motion and Brief in Support of Motion for Summary Judgment. (Pl. Brief). The parties filed oppositions to each other's motions (Def. Opp. and Pl. Opp., respectively), as well as Concise Statements of Material Facts (Def. Statement and Pl. Statement, respectively) and Responses to each other's Concise Statements. (Def. Response and Pl. Response, respectively). On November 27, 2006, the UMWA filed a Reply to Irvin's Opposition to its Motion. (Def. Reply). Irvin did not file a reply brief in support of his Motion.

After careful consideration of the Trustees' decision, the memoranda of the parties and the entire record, including the arguments of counsel made at the hearing of this matter on January 5, 2007, the Court entered an Order granting summary judgment to the UMWA. Irvin appealed on February 5, 2007 and this Memorandum Opinion is the Court's written explanation of the decision made after oral argument to facilitate appellate review of the case.

## II.     Procedural and Factual History

It is axiomatic that a district court analyzing a motion for summary judgment "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in favor of that party. *See Hugh v. Butler County Family YMCA,* 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In the instant case, both parties have moved for summary judgment and the Court is permitted, but not required, to resolve cross-motions for summary judgment concurrently. *See InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown,* 318 F. Supp.2d 230, 235 (M.D. Pa. 2004) (describing concurrent resolution of cross-motions for summary judgment as "a formidable task"); *see also* 10A Charles Alan Wright *et al.*, Federal Practice and Procedure §2720 (3d ed.

1998). Although the summary judgment standard is the same, the motions must be construed independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *See* Fed. R. Civ. P. 56; *see also Grove v. City of York,* 342 F. Supp.2d 291, 299 (M.D. Pa. 2004); *United States v. Hall,* 730 F. Supp. 646, 648 (M.D. Pa. 1990). In the case at bar, Irvin admitted the facts asserted in the UMWA Concise Statement, denying them only "as to their materiality." (*See* Pl. Response at 1).

Irvin began working as a coal miner in Pennsylvania in 1968 and three years later, was diagnosed as suffering from schizophrenia and sociopathy. (R. 22, 262). While Irvin sought treatment throughout the 1970's at the Western Psychiatric Institute and Clinic (WPIC), St. Francis General Hospital, and Woodsville State Hospital, the psychiatric consensus was that he was schizophrenic. (*See* Def. Statement ¶¶ 15-20, *see also* R. 22, 203, 206, 211, 213-15, 258, 268). Irvin was hospitalized several times for hallucinations or depression and in September 1979, police brought Irvin to the hospital after finding him "walking in traffic and trying to get hit by cars." (R. 203, 207, 210, 214). By November 1979, Irvin had been hospitalized for psychiatric treatment on nine separate occasions, although the genuineness of his subjective complaints was questioned.[2] (R. 219). Like Irvin's doctors, his employers regarded his "long

---

[2] By 1975, at least one doctor suspected that Irvin was malingering. (*See* R. 22). Another doctor noted that Irvin "appears to have his own agenda" for seeking treatment, and reiterated that he had a "hidden agenda." (R. 212). This was confirmed weeks later by Irvin himself, who confessed that he had lied to hospital personnel about his symptoms "in order to be admitted so that he would have a place to stay." (R. 202). Irvin also told doctors that he was a Vietnam veteran who sustained shrapnel wounds in the war, and then later admitted having lied about this. (R. 210, 212). By November 1979, one doctor noted that Irvin was "obviously malingering," and observed that he had admitted doing so in the past. (R. 219). Although malingering was never ruled in or out of the diagnosis, the record supports the conclusion that Irvin "used multiple hospitalizations as part of a transient lifestyle when he had no place to live or financial resources." (R. 23).

standing history of using multiple hospital contacts to legitimize his absenteeism" with a jaundiced eye: at least one mining company fired him for "chronic absenteeism." (R. 124-25, 204). Notwithstanding his mental impairment, and despite suffering from self-described alcohol and gambling addictions, Irvin continued to work for various mining concerns, although he was unemployed for long periods between jobs. (R. 22-23, 30, 189, 213, 226, 262).

Irvin's last employer was Pennsylvania Mines, LLC Greenwich Collieries (Penn Mines), where he began working on December 17, 1979. (Def. Statement ¶ 5; *see also* R. 280). While working in a mine shaft at Penn Mines on January 18, 1980, Irvin suffered a compound fracture to his right thumb. (Def. Statement ¶¶ 6-7; *see also* R. 101, 158). He was out of work from the date of the accident until April 2, 1980, when he returned for a short while — only to leave again on May 16, 1980, when his thumb pain returned. (*See* Def. Statement ¶¶ 8-10; *see also* R. 280). Irvin underwent successful surgery in June 1980, but lost 80% of the use of his right thumb.[3] (*See* Def. Statement ¶¶ 13-14; *see also* R. 101, 104, 285).

In January 1981, Irvin told Penn Mines that he was going to seek mental health treatment in the wake of the accident, which he claimed left him feeling "uncertain of himself going back into the mines to work." (*See* Def. Statement ¶¶ 22-23; *see also* R. 285). In March 1981, Irvin went to the Indiana County Guidance Center (ICGC), where he asked doctors to call Penn Mines and inform them that he had been unable to work for the previous five weeks because of depression. (R. 224). When doctors refused to do this unless Irvin accepted treatment, he went home to "think it over." (R. 224).

---

[3] During each of these absences in 1980 and 1981, Irvin received workers' compensation benefits or sickness and accident benefits. (*See* Def. Statement ¶¶ 8, 11, 26; *see also* R. 160, 268, 280).

4

Irvin was terminated from Penn Mines on June 29, 1981. Following an arbitration hearing in August 1981, however, his termination was rescinded and reduced to a three-month unpaid suspension. At that time Penn Mines encouraged Irvin to seek counseling at ICGC and he consented. (R. 40, 158, 224-25, 268). By December 1981, Dr. Richard Tomb reviewed Irvin's longitudinal record of psychiatric hospitalizations, noted that "there is a manipulative quality to each of the admissions," and recorded his suspicion that Irvin was sociopathic. (R. 228). On March 19, 1982, Irvin informed Penn Mines that he was resigning. (R. 106).

For approximately one week in October 1982, Irvin committed himself to WPIC again, reporting auditory hallucinations, depression, and homicidal ideations. (R. 229-31). Once more, doctors noted that Irvin was "quite manipulative" and observed that part of his motivation was to "obtain[] a living situation post discharge." (R. 231). WPIC staff recommended a boarding home placement, which Irvin accepted. (*See id.*). In November 1982, however, Irvin admitted himself to St. John's General Hospital and St. Francis General Hospital, where he was treated for paranoid schizophrenia and alcoholism. (*See* Def. Statement ¶¶ 33-35; *see also* R. 189, 196-97). Irvin also checked himself into these hospitals in July 1983, where he was again diagnosed with paranoid schizophrenia and alcoholism. (Def. Statement ¶¶ 36-37; *see also* R. 165, 170, 172, 184). Once more, Irvin left the hospital against the advice of his physicians. (R. 166).

The diagnosis of schizophrenia was supported by a physician for the Pennsylvania Board of Disability Determination in 1985, although that physician had not seen Irvin's past medical records. (Def. Statement ¶¶ 38-39; *see also* R. 173, 247-49). Shortly thereafter, the Social Security Administration (SSA) found Irvin to be disabled from "schizophrenia reaction, chronic undifferentiated type" with an effective date of January 15, 1985. (Def. Statement ¶ 40; *see also*

5

R. 162). From 1985 until 1988, Irvin received occasional treatment for minor physical ailments,[4] and no treatment for mental impairments until April 1988 when, in advance of a continuing disability review to be conducted by the SSA later that year, he again consulted a physician with the Pennsylvania Board of Disability Determination. (Def. Statement ¶ 44, *see also* R. 234-39). That physician opined that Irvin was "actively psychotic" and needed hospitalization. (*See* R. 236). Accordingly, Irvin continued to receive disability benefits from the SSA. (R. 28).

For the next fifteen years — from 1988 until October 2003 — there is no record of Irvin receiving *any* mental health treatment. In 1998, Irvin applied for a service pension from the Trust, but did not apply for a disability pension. (*See* R. 27-31). The Trustees denied that application because Irvin only had worked for eight of the required ten years of service. (Def. Statement ¶ 45; *see also* R. 41). In 2002, Irvin applied for an "age 55 retirement pension," but this application was denied for the same reason that his service pension application had been rejected. (Def. Statement ¶ 46; *see also* R. 50). After Irvin appealed that decision and a hearing was held, that appeal was denied on March 11, 2003. (Def. Statement ¶ 47; *see also* R. 276-77).

Finally, in December 2003, Irvin applied for the disability pension at issue in this case. (Def. Statement ¶ 48; *see also* R. 201). For the first time, Irvin claimed that he was disabled by the "injured right thumb" he sustained in the January 1980 mining accident. (R. 156). In January 2004, Irvin submitted a letter to the SSA, in which he wrote that the accident left him "emotionally and physically unable to return to [his] duties in the mining industry," and claimed

---

[4] Irvin represented to the SSA that, in November 1985, he sustained gunshot wounds to his shoulder, chest, and stomach. (R. 240). The record does not reflect any medical treatment for these wounds, however; instead, the record only shows treatment for two trip-and-fall accidents and an earache in 1987 and 1988. (*See* Def. Statement ¶¶ 41-43; *see also* R. 176-80).

that his "disability stems from mental and emotional issues that have rendered [him] totally incapable of holding a job." (Def. Statement ¶ 49; *see also* R. 99).

On April 26, 2004, after reviewing Irvin's entire medical record, the Trustees denied his application. (Def. Statement ¶ 50; *see also* R. 151-55). In light of Irvin's history of schizophrenia and his work record preceding the 1980 mine accident — and considering that there were no treatment records around the time of that accident — the Disability Pension Analyst concluded that, although Irvin is schizophrenic, "the records failed to link the diagnosis with the mine accident." (R. 154).

On September 27, 2004, Irvin appealed the Trustees' decision with counsel's assistance. (Def. Statement ¶ 51; *see also* R. 118). In support of that appeal, Irvin submitted a one-page opinion by John Jarzynka, M.A., of the Turtle Creek Valley Mental Health/Mental Retardation, Inc., and the write-up of a confidential psychological evaluation completed by Dr. Gregory Nicosia, a licensed psychologist with Advanced Diagnostics, P.C. Trauma Specialists. (R. 119-139). In a letter addressed to the Department of Labor and dated September 21, 2004, Mr. Jarzynca stated:

> [Irvin] was seen in treatment at Turtle Creek Valley MH from October 2003 through June 2004. [He] was seen by both a psychiatrist and therapist during this time. [He] was diagnosed with an Axis I condition of Posttraumatic Stress Disorder, Chronic. This condition was related to the serious accident [he] suffered at work in the coal mine during 1980. This condition prevents [Irvin] from working.

(*See* R. 138; *see also* Def. Statement ¶ 53). On September 10, 2004, Dr. Nicosia — who first saw Irvin on July 15, 2004 — diagnosed him with post-traumatic stress disorder (PTSD), opined with "a reasonable degree of psychological certainty" that Irvin's PTSD was caused by the 1980

7

mine accident, and concluded that Irvin "remains to this day incapable of returning to his previous work as an underground miner." (Def. Statement ¶52; *see also* R. 121-23).

The Trustees reconsidered Irvin's application in light of this new evidence. (*See* Def. Statement ¶ 55; *see also* R. 86-97). On November 16, 2004, the Disability Pension Analyst concluded, as she had previously, that Irvin had not demonstrated a causal link between the 1980 mine accident and his disability. (R. 96). After noting that "the SSA determined [Irvin] to be disabled as a result of schizophrenia" — and not PTSD — the Analyst concluded that "even if [Irvin] now suffers from PTSD, based on a preponderance of the medical evidence [...] it would not be reasonable to conclude that [PTSD] was caused by, or was substantially related to, the January 18, 1980 mining accident." (R. 97).

Once again, Irvin appealed and requested another hearing. (Def. Statement ¶ 56; *see also* R. 72). This time, Irvin submitted two additional pieces of evidence: a letter from Dr. Jack Mannheimer, and an undated, unsigned Employer's Work History. (R. 15-16, 25). In the letter, Dr. Mannheimer explained that Irvin was under his care since July 20, 2004 for PTSD. (R. 16). Dr. Mannheimer added:

> [Irvin's PTSD] relates to his experience of a traumatic event, the mining accident, [on] January 18, 1980. [He] will require mental health therapy until he resolves the traumatic event well enough that he is not preoccupied with thoughts or flashbacks of the mining incident on a daily basis. He would not be able to return to work in the coal mines as long as he carries an active diagnosis of [PTSD], related to the mining accident, because it would exacerbate the current trauma or re-traumatize him.

(*Id.*) Although it is unclear whether Dr. Mannheimer had the benefit of reviewing Irvin's entire medical record, he had seen Dr. Nicosia's September 10, 2004 findings, which were "consistent"

8

with his own. (*See id.*). The Employer's Work History, which purported to summarize Irvin's history at Penn Mines stated, in pertinent part:

> Upon [Irvin's] return to work on April 2, 1980, he was unable to perform his job due to the physical and mental anguish he suffered. As a result of the accident of January 18, 1980, [he] lost time from work. We advised [him] that we were going to terminate him. [Irvin] advised [his supervisor] the reason he was missing work was because of the accident and [because he] felt unsure of himself going back into the mines to work and felt that he should see someone regarding his condition. [Irvin] advised us he was going to seek help at the [ICGC].

(R. 25). The report further noted that, when Irvin eventually resigned from his job at Penn Mines, he told his supervisor that "he could no longer perform his job under the condition that resulted from the accident." (R. 25).

On June 2, 2005, after reviewing Dr. Mannheimer's letter and the Employer's History Report, and upon reconsidering all of the other evidence in the record, the Analyst upheld her previous determinations that the 1980 mine accident did not cause Irvin's disability. (*See* Def. Statement ¶ 57; *see also* R. at 1-13).

### III. Standards of Review

The 1974 Pension Trust was established pursuant to the National Bituminous Coal Wage Agreement of 1974 and in accordance with Section 302(c) of the Labor-Management Relations Act of 1947, 29 U.S.C. §186(c). Article II.C of the Trust provides, in pertinent part:

> A participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled *as a result of a mine accident* . . . shall, upon retirement (hereinafter "Disability Retirement"), be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by

> reason of such accident such Participant is subsequently
> determined to be eligible for Social Security Disability Insurance
> Benefits under Title II of the Social Security Act or its successor.

*See* Article II.C., 1974 Pension Trust, Ex. B at 5 (emphasis added). Under the terms of the Trust, to be eligible for disability pension benefits, an applicant must establish that (1) he is totally disabled as demonstrated by a Social Security Disability Income (SSDI) award; (2) he must have suffered a mine accident as defined under the terms of the Plan; and (3) the mine accident must be the cause of his disability. *See id.* at Article II.D; *see also Fotta v. Trustees of the UMWA Health & Ret. Fund of 1974,* 319 F.3d 612, 617 (3d Cir. 2003). The Trustees owe a fiduciary duty to grant benefits to any plaintiff who, in accordance with the requirements of the Trust, can demonstrate that he has been totally disabled as a result of a mine-related injury suffered while performing classified work for a signatory employer. *See UMWA Health & Retirement Funds v. Robinson,* 455 U.S. 562 (1982).

When a plan gives an administrator discretion to determine eligibility for benefits or to construe its terms, as is true of the Trust, this Court must review the Trustees' decision under the arbitrary and capricious standard and should affirm their determination as long as it is supported by substantial evidence, even if the record also contains substantial evidence which would support a different result. *See Mitchell v. Eastman Kodak Company,* 113 F.3d 433, 437 (3d Cir. 1997); *see also Moats v. UMWA, Health and Ret. Funds,* 981 F.2d 685, 689 (3d Cir. 1992). "[A] plan administrator's decision will be overturned only if it is clearly not supported by the evidence on the record or the administrator has failed to comply with the procedures required by the plan." *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.,* 222 F.3d 123, 129 (3d Cir. 2000) (internal citation omitted). This is, in essence, an abuse-of-discretion

standard, and it precludes the Court from substituting its own judgment — even if it disagrees with the Trustees' decision — where there is no abuse of discretion. *See Abnaytha v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 n.4 (3d Cir. 1993); *see also Mitchell*, 113 F.3d at 439.

### IV.   Analysis

In its Motion, the UMWA concedes that Irvin has proven the first two prongs of the analysis set forth in Article II.D of the 1974 Pension Plan, *viz.*, that he is disabled and he suffered a mine accident on January 18, 1980. Nevertheless, the UMWA contends that Irvin failed to prove that the mine accident *caused* his disability. (*See* Def. Brief at 16-17). In his own Motion, Irvin argues that he has met his burden of proving all three prongs of Article II.D. (*See* Pl. Brief at 7-8; *see also* Pl. Opp. at 1-3).

As noted previously, Irvin bears the burden of proving that the 1980 mine accident caused his disability. *See Fotta*, 319 F.3d at 617; *see also Pacconi v. Trustees of the UMWA, Health & Ret. Fund of 1974,* No. 05-CV-1488, 2006 WL 3064106, at *3 (W.D. Pa. Oct. 26, 2006). An applicant can establish proximate cause by: (1) showing that the mine accident "directly caused" his disability; or (2) proving that the mine accident indirectly "caused his disability by substantially aggravating a pre-existing condition." *See Fotta*, 319 F.3d at 617. Here Irvin does not claim that the mine accident aggravated his pre-existing psychiatric condition. Instead, his challenge to the Trustees' denial of benefits is predicated on the first theory: *i.e.*, that the mine accident directly caused his PTSD. (*See* Pl. Brief at 8).

Irvin contends that the Trustees "entirely failed to consider" his evidence of causation, *viz.*, opinions offered by Mr. Jarzynka, Dr. Mannheimer, and Dr. Nicosia. (*See* Pl. Brief at 5-8).

11

But a review of the decision denying benefits confirms that the analyst did not "ignore" any of this evidence. Indeed, the Analyst criticized Mr. Jarzynka's opinion on the ground that it was unsupported by a single treatment note. (*See* R. 5, 13). This was a legitimate reason to reject it.[5] The Analyst also expressed skepticism of Dr. Nicosia's opinion because it was predicated on Irvin's version of the accident, which appeared to change significantly over time. (*See* R. 11-12). This also was a valid reason to reject Dr. Nicosia's conclusions.[6] Finally, the Analyst noted the limitations of Dr. Mannheimer's opinion, which found only that Irvin's PTSD "relates to" the accident. (R. 3-4). Because Irvin bore the burden of proving that the mining accident *caused* — and was not merely "related to" — his PTSD, the Analyst was within her discretion to conclude that Dr. Mannheimer's opinion was weak evidence of causation.[7]

A searching examination of the decision in light of the record as a whole also confirms that the Trustees gave these after-the-fact diagnoses and opinions sufficient weight. Although it is unclear what weight (if any) a physician's retrospective diagnosis deserves in ERISA cases, in the Social Security context the Third Circuit has observed that the "[r]etrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records [...] can support a finding of past impairment" as long as it is "corroborated by lay evidence relating back to the

---

[5] *See Lango v. Director, Office of Workers' Compensation Programs* 104 F.3d 573, 577 (3d Cir. 1997) (ALJ could require more than conclusory statement as to the cause of miner's death); *see also Santiago v. Barnhart,* 367 F. Supp.2d 728, 736 (E.D. Pa. 2005) (absence of objective tests or treatment notes is valid reason for discounting a treating physician's opinion).

[6] *See, e.g., Lamar v. Brown,* 8 Vet. App. 14, No. 94-104, 1995 WL 285507, at *2 (Vet. App. May 12, 1995) (veteran's changing story about airplane crash was valid reason to find PTSD diagnosis unsubstantiated).

[7] *See, e.g., Port Authority of New York and New Jersey v. Arcadian Corp.,* 991 F. Supp. 390, 405 (D. N.J. 1997) (factors "related to" accident not necessarily legal cause).

claimed period of disability."[8] *Newell v. Commissioner of Social Security,* 347 F.3d 541, 547 (3d Cir. 2003). However, even in the Social Security context, courts have recognized that "a treating physician making a retrospective diagnosis today is in no better position to evaluate his patient's condition as of a past date than any other physician examining the patient today. Thus, a treating physician's diagnosis deserves little added weight in a retrospective diagnosis case." *Lazzara v. Secretary of Health and Human Services,* No. 81-CV-449, 1988 WL 23288, at *2 (E.D. N.Y. Feb. 29, 1988).

Assuming without deciding that *Newell*'s discussion of the weight to be given retrospective diagnoses can be imported from the Social Security context into ERISA, the key word in *Newell*'s formulation is "corroborated." In Irvin's case, the Analyst explained that she rejected the conclusion that Irvin's PTSD was caused by the mine accident because it could not be squared with the evidence in the record as a whole:

> Subsequent to 1988, there is no evidence that [Irvin] sought additional medical intervention until October 2003. [....] The diagnosis of PTSD did not appear in the records prior to October 2003, twenty-three years after the mining accident. Review of [his] pre- and post-accident psychiatric records indicate that his mental condition/ability to function subsequent to the mine accident is not objectively discernible from that which predated it.

(R. 13). Thus, it was reasonable for the Analyst to conclude that the complete absence of evidence that Irvin received *any* mental health treatment from 1988 to 2003 cast serious doubt on his doctors' belated conclusion that he had been suffering from PTSD since 1980. *Cf. Newell,*

---

[8] The Court observes that, "although social security cases are not precedential in the ERISA context, they may be used for guidance." *Sanderson v. Continental Cas. Corp.,* 279 F. Supp.2d 466, 476 (D. Del. 2003) (citing *Torix v. Ball Corp.,* 862 F.2d 1428, 1431 (10th Cir. 1988)).

13

347 F.3d at 547 (lack of contemporaneous medical evidence not dispositive when claimant provided adequate explanation for failure to seek regular medical treatment for time in question). In light of the fact that Irvin has offered no explanation for his failure to obtain treatment for any mental impairment at any time from 1988 until the first diagnosis of PTSD in 2003, the Analyst's skepticism of this evidence was neither arbitrary nor capricious. *See Mitchell,* 113 F.3d at 437; *see also Moats,* 981 F.2d at 689.

Nor does any of the pre-1988 evidence in the record corroborate Irvin's physicians' *post hoc* conclusion that the 1980 mine accident caused his PTSD. The Analyst's finding that the diagnostic impressions of Irvin's mental impairment in the years prior to the 1980 mine accident did not differ materially from the diagnoses recorded in the years immediately following the accident (*see* R. 12-13) is supported by substantial evidence. Indeed, from 1971 to 1988, Irvin repeatedly was diagnosed with schizophrenia, and never was diagnosed with PTSD during that period. (*See* R. 22-23 (memorializing doctors' repeated diagnoses of schizophrenia in the 1970's) *with* R. 165, 170, 172, 184, 189, 196-97, 247-49 (showing additional diagnoses of schizophrenia after the mine accident in the 1980's)). To the extent Irvin was diagnosed with anything beyond schizophrenia after the 1980 accident, those echoed diagnoses that had been made *before* the accident. (*Compare* R. 228 (memorializing doctor's 1981 suspicion that Irvin was sociopathic) *with* R. 22 (memorializing the same secondary diagnosis by WPIC physician in 1971)). Even Irvin's pattern of checking into hospitals and leaving whenever he saw fit was a *modus operandi* that he continued without significant alteration before and after the mine accident. (*Compare* R. 224-25 (after requesting hospitalization in March 1981, Irvin left "against medical advice" after two days) *with* R. 204-05 (after checking himself into WPIC in November

1978, Irvin "eloped from the unit" five days later when his doctors declined to discharge him)). Finally, the Court's review of the record confirms that — if anything — Irvin sought hospital treatment for his mental disorder *less frequently* after the accident, than he had before. (*Compare* R. 22-23 (Irvin hospitalized no fewer than twelve times for mental health complaints in the 1970's) *with* R. 165, 170, 172, 184, 189, 196-97, 224-25, 229-31 (Irvin hospitalized only six times for mental disorders from 1981 and 2004, and never hospitalized for psychiatric complaint after he received SSA benefits in 1985)).

Despite all the foregoing, Irvin insists that he "was awarded Social Security disability benefits based on impairments related to the January 18, 1980 mine accident." (Pl. Brief at 4). In actuality, the factual basis for the SSA's finding of disability in 1985 undercuts his claim that the mine accident caused his disability. Although the Trust provides that the receipt of benefits from the SSA conclusively establishes disability, it assuredly does not provide that the receipt of such benefits conclusively establishes that the recipient's disability was caused by a mine accident. *See Moats*, 981 F.2d at 689 n.3 (Alito, J.). On the other hand, it is true that the substance of the SSA's findings can be "salient" evidence on the question whether a mine accident caused a disability. *See Chicarelli v. UMWA Health and Ret. Funds*, 943 F.2d 457, 462 (4th Cir. 1991). In sum, a SSA disability award must be scrutinized to determine whether it supports or detracts from a claimant's evidence that a mine accident caused his disability. This inquiry involves two fundamental assessments: how close in time the SSA's onset date was to the mine accident that allegedly caused the disability, and whether the disability the SSA actually found is the same impairment the claimant contends was caused by the mine accident.

In the case at bar, both of those assessments cut against a finding of causation. Contrary

to Irvin's claim that the January 18, 1980 accident caused him to suffer PTSD, the SSA's disability award was predicated on a different onset date (January 15, 1985) and a different impairment altogether (chronic schizophrenia). (*See* R. 162). The Court cannot ignore the substantive medical distinction between the psychotic disorder (*i.e.*, schizophrenia) that forms the basis of Irvin's SSA disability award, and the anxiety disorder (*i.e.*, PTSD) that his doctors opined was disabling in 2003. *See Ascherl v. Brown,* 4 Vet. App. 371, 377 (1993) (noting that PTSD is subject to different regulatory and diagnostic criteria than schizophrenia).[9] Likewise, the Court cannot overlook the implications that the five-year gap between the SSA's onset date and the mine accident has on the evidence of causation. *See Richards v. UMWA Health & Ret. Fund,* 895 F.2d 133, 138 (4th Cir. 1990) (in cases involving claims of disability under the 1974 Pension Plan, courts give great weight to onset date for social security purposes); *see also Chicarelli,* 943 F.2d at 459 (same).

Irvin's final argument is that the Trustees' denial of benefits is arbitrary and capricious because it is unsupported by "any expert opinion" to contradict his treating physicians' 2004 opinions. (Pl. Opp. at 2). Irvin cites no authority for the proposition that the Trustees were required to marshal expert evidence to support their denial of benefits, and the Court is aware of no such authority. To the contrary, the United States Supreme Court has observed that, in the

---

[9] In Irvin's emphasis upon a November 19, 2003 communication from the SSA — which notes that the SSA's records show that his "primary diagnosis is schizophrenic, paranoid and other functional psychotic disorders" — he apparently reads the phrase "other functional psychotic disorders" to include his PTSD. (*See* Pl. Brief at 5 (citing R. 98)). The Court will not make the inference that the catch-all phrase "other functional psychotic disorders" implies PTSD because PTSD is not a psychotic disorder. *Compare* 38 C.F.R. §4.130, diagnostic code 9411 (reflecting that PTSD is an anxiety disorder) *with* 38 C.F.R. §4.130, diagnostic code 9210 (grouping psychotic disorders under the diagnostic heading of "Schizophrenia and Other Psychotic Disorders")).

16

ERISA context — unlike in the Social Security disability context — a plan administrator is under no obligation to defer to a treating physician's opinion. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003); *see also Roumeliote v. Long Term Disability Plan For Employees of Worthington Industries*, No. 05-CV-847, 2007 WL 201031, at *3 (S.D. Ohio Jan. 23, 2007) (ERISA "plan administrator is not required to conduct a physical examination or hire an outside physician"). In any event, Irvin's argument puts the cart before the horse; under *Newell*, the retrospective diagnosis of a treating physician cannot support a finding of disability *until* a claimant meets his burden of producing some other evidence to corroborate his claim that the mine accident caused his disability. *See Newell,* 347 F.3d at 547.

In the end, Irvin has not marshaled any evidence to corroborate his doctors' retrospective diagnoses of PTSD pre-existing 2003, the year he first was treated for this impairment. Instead, the overwhelming weight of the evidence reflects that Irvin had a long history of schizophrenia *prior to* the 1980 mine accident, and that this was the main psychiatric complaint for which he received treatment from 1971 until 1988, when he saw a psychiatrist in advance of the SSA's continuing review of his disabled status. When doctors diagnosed Irvin with PTSD in 2003, the diagnosis was *sui generis*: there is simply no evidence of record that Irvin suffered from PTSD prior to 2003, or that his PTSD was caused by the 1980 mine accident. It bears emphasis that, although "retrospective diagnosis and subjective testimony can be used to diagnose a physical or mental condition, this type of evidence alone cannot justify an award of benefits." *Gagliardi v. Apfel,* No. 97-CV-4933, 1998 WL 631976, at *1 (E.D. Pa. Aug. 28, 1998) (citation omitted). Because Irvin has adduced no other evidence to support his claim, the Court finds that the Trustees did not abuse their discretion in denying Irvin's application for a disability pension.

## V. Conclusion

For all the foregoing reasons, the Court concludes that the Trustees' determination is supported by substantial evidence.

*[signature: Thos M. Hardiman]*

Thomas M. Hardiman
United States District Judge

February 15, 2007